Frank J. Pellico, et al., Plaintiffs-Appellants, v. Earl Jackson, George Boese, Sam Klevneo, a/k/a Sam Kleveno, d/b/a The Ragdoll Tavern, Shirley Oddo, d/b/a Oddo's Restaurant and Lounge, Carmen Trimarco and Frances Trimarco, Defendants-Appellees.
Earl Jackson, Counter-Plaintiff, and James Erickson, Counter-Plaintiff-Appellee, v. Frank J. Pellico, Counter-Defendant-Appellant.

Gen. No. 49,919.

First District, Second Division.

May 10, 1966.

Rehearing denied June 7, 1966.

Epton, McCarthy, Bohling & Druth and Gerard A. Serritella, of Chicago (Bernard E. Epton, Alfred S. Druth, Gerald M. Chapman and Donald Segal, of counsel), for appellants.

Orner & Wasserman, of Chicago (Norton Wasserman, of counsel), for defendants-appellees.

H. P. Hutul, of Chicago (Arthur M. Gorov, of counsel), for counter-plaintiff-appellee, James Erickson, and defendant-appellee, Earl Jackson.

Lloyd P. Douglas and Sydney W. Hollander, of Chicago, for defendants-appellees, George Boese and Sam Kleveno, d/b/a The Ragdoll Tavern.

MR. PRESIDING JUSTICE BRYANT delivered the opinion of the court.

This appeal comes from a judgment entered March 13, 1964, in the Circuit Court of Cook County following a jury verdict which found for the plaintiff Stephanie Pellico in the sum of $10,000 and which found for the counter-plaintiff James Erickson in the sum of $15,000.

The complaint as amended charged the defendant Earl Jackson with the wilful and wanton, careless and improper operation of his automobile which, it is alleged, resulted in an automobile accident in which the plaintiffs Frank J. Pellico and his wife, Stephanie, were injured. The plaintiffs alleged that they exercised due care for their own safety.

Other parties brought in as defendants in this action were George Boese and Sam Kleveno, operators of a tavern known as The Ragdoll Tavern and the Oak Park National Bank as trustee of a land trust which held title to the property on which the Ragdoll Tavern was located. Other party defendants were Shirley Oddo, the operator of a tavern known as Oddo's Restaurant and Lounge, and Carmen and Frances Trimarco as owners of the property on which Oddo's Restaurant and Lounge was located. It was alleged that the defendant Earl Jackson was sold or given intoxicating liquor at each of the above mentioned taverns which contributed to intoxication on his part, and that this intoxication contributed to the accident in which the plaintiffs were injured.

In a separate count, an action was brought by the plaintiffs Frank and Stephanie Pellico against one Dan Engels doing business as Engels Rambler Sales, in which it was alleged that Earl Jackson was an employee of Engels Rambler Sales, and that the automobile which the defendant Jackson was driving was owned by Engels Rambler Sales and was being driven with the consent of the owner and in the course of Jackson's duties as an employee.

317

A counterclaim was filed in this suit by Earl Jackson and James Erickson, a passenger in the Jackson car. This counterclaim alleged that Erickson and Jackson were exercising due care for their own safety and that the accident was caused by the negligence of Frank J. Pellico.

The matter went to trial on March 4, 1964, on the issues as set forth in the complaint, countercomplaint and answers. The evidence brought out at the trial was as follows:

Frank J. Pellico, one of the original plaintiffs, testified that he was driving a 1959 Mercury automobile at about 4:45 p. m. the day of the accident, April 17, 1960. This was Easter Sunday, and Mr. and Mrs. Pellico were on their way back from his sister's house when the accident occurred. He stated that he remembered that the streets were wet and that there was a very light drizzle. According to this witness, the traffic was "very, very light."

This witness further testified, "I was traveling north on River Road near where it intersects with King Street; King Street comes in on River Road at about 3500 North. River Road was a four lane highway with double yellow lines running down the center. Two lanes go north, and the other two south. River Road has some windings, and turnings. Just prior to 3500 North there is a bend, or a curve, just before that intersection in River Road. . . .

"I was traveling in the extreme right-hand, outside, or east, lane. If there was a curb, which there is not, that would be the curb lane. The traffic was very light, and that was the proper lane to be driving in at that time. . . .

"We proceeded that way because I had to make a right turn when I reached Lawrence to go to my home. Lawrence is about 46 or 4700 North.

318

"The point of impact would be approximately 10 or 11 blocks south of Lawrence. My windshield wipers may have been on. It was drizzling lightly. My radio was not on.

"As we were driving north, I made a comment to my wife. I noticed two or three cars going south, in the opposite direction. When we approached this area where there was a large body of water on the left side of River Road, which I would say was about 50, or maybe 100, feet in length, covering the complete west side of the road, the one lane, and maybe just a foot over the center lane, next to the double line, which gave the southbound traffic plenty of room to go by. There were barricades in front of that water, warning motorists of the water ahead. I saw the barricade. It was directly in the lane that had the main body of water in it, the extreme west lane. . . . The barricade was in the southbound curb lane on River Road. There was a lane open on River Road for southbound traffic. . . . I saw cars coming in the southbound lane. . . .

"Prior to the accident, I saw the Jackson car approaching in that area. I was still proceeding in my east lane. I next saw the Jackson car when it was on my left side, after the impact. . . ."

On cross-examination Pellico said, "at this time, I do not recall whether I saw his car at any time within 50 feet of my car. . . . I did not apply the brakes to my automobile at any time prior to this occurrence. . . . I don't recall whether, or not, I had the windshield wipers on the car. There being a light drizzle, I may have had them on. . . . I don't remember now. It's possible that I may have had them on. My lights were not on. The day was overcast, but it was light enough so you did not need lights on." This witness further testified that he did not have his car radio on at the time of the accident.

The next witness to testify was Stephanie Pellico, the other original plaintiff in the lawsuit. Concerning the accident, she testified, "I remember the lane in which my husband was driving after he crossed Belmont Avenue. [It] was the lane on the far east side."

The following witness was one John Blaski. This witness stated that he was an amateur photographer. He took pictures of the scene of the accident shortly after it occurred. Blaski did not see the accident happen, but the photographs were taken before the automobiles involved were moved and even before the injured were taken away. This witness stated that he saw debris in the area of the Mercury, the Pellicos' car. "The debris was sheet metal and glass. I cannot be certain whether there was any other debris. As to its location with reference to the lanes of traffic on River Road, it was pretty well all over. There was no particular spot where I noticed it. . . .

"The other car was south of the Mercury, between one and two car lengths. I could not say what lane of traffic the Plymouth was in. When I got out of my car before I took the pictures, I observed puddles of water on River Road. I would say the puddles covered about half of the paving on River Road on the west side. . . . It [the water] covered the southbound lanes of traffic. It could have extended into the northbound lanes of traffic; I don't know if it did." After examining the pictures to refresh his recollection, the witness said he did not think the water extended into the northbound lanes, but he could not say positively. The witness identified part of a broken barricade in the picture.

James Erickson, one of the counter-plaintiffs and passenger in the automobile driven by Earl Jackson, was called as an adverse witness pursuant to section 60 of the Civil Practice Act, Ill Rev Stats, 1963, art 110, sec 60. He said that he knew Earl Jackson and had seen him the day before the accident at about 8:00 p. m. in

the Ragdoll Tavern. Erickson continued, "When I entered the lounge, he was sitting at the bar. I wouldn't know if he had a drink in front of him. . . . I sat down about three or four stools away from Jackson. A few other fellows were sitting in between us. There was a bartender behind the bar. . . . I can't recall who the bartender was. The bartender served all of us. I don't know whether he served Jackson or what. . . . As to whether he served Jackson, I wasn't drinking with Jackson. I don't recall whether he was drinking at 8:00. . . . I sat four bar stools away from Jackson. . . . I can't recall whether Jackson was in the Ragdoll from 8:00 o'clock to 12:00 o'clock. . . . He might have went out between then. I saw him at the Ragdoll off and on between those times. I saw him sitting at the bar, standing up, and dancing. . . . I saw him dancing with Mary Golich during that time. I do not recall how many times I saw him dancing with her. I don't recall seeing him leave the Ragdoll during that time. . . .

"I saw Earl Jackson consume liquors in the Ragdoll between 8:00 to 12:00 o'clock. I saw him consume beer. The bartender . . . served it to him. To my knowledge, he did not consume any other type of alcoholic liquors. I wasn't sitting with him. I don't know how many beers he consumed." This witness testified that he had consumed approximately 4 or 5 beers during the evening in question. He said that he did not notice anything unusual about Jackson that evening.

According to this witness, Jackson, Mary Lou Golich and he drove to Oddo's Lounge. Jackson drove, and Erickson testified that he did not notice anything wrong with his driving. Once they arrived at Oddo's, "I saw Jackson once in a while, off and on. There was a big crowd there. I saw Jackson off, and on, from 12:30 to 6:00 a. m. I saw Mary Golich off and on too. . . . I can't recall whether I saw Jackson dancing with Mary Golich because there were about fifty people there. I wasn't

321

especially looking for Jackson and Mary Lou. I can't recall whether I bought any drinks for Jackson at Oddo's, or whether he bought any drinks for me. I bought drinks for someone there. . . .

"All I drank all night was beer. . . . I had some drinks after 12:00. Jackson had beer to drink with me at the Ragdoll after 12:00 o'clock. We were sitting together at the time. . . .

"I saw Jackson drinking beer at the Ragdoll. I don't know how many beers I saw him drinking. I wasn't counting. . . . As to whether I saw Jackson drinking more than one beer after midnight at the Ragdoll, I don't know. I wasn't keeping track of how much he was drinking. Maybe he had one, two or three—that's all. . . .

"I couldn't say that I was drinking with Jackson at Oddo's because I was mostly by myself. I got there with Jackson. I can't recall whether I saw him consume any alcoholic beverages or beer at Oddo's. From the time I got there until 2:00 o'clock, I would see Jackson on the floor, dancing. That is about all I saw [of] him in Oddo's. . . . I did not see him at any time with a drink in his hand."

Erickson then said that when they were finished at Oddo's he, Jackson and Mary Lou Golich went to his house. This was about 7:00 o'clock in the morning. "At my house, I went to bed. I told Mary Lou that she could use my bedroom and Jackson, that he could use my mother's bedroom, and I took the couch. I went to sleep." The next time he saw them was around 4:00 o'clock that afternoon.

This witness said that when he got up that afternoon, the three of them had something to eat. He said that they did not have anything to drink. According to this witness, Earl Jackson was not drunk the afternoon of April 17, 1960.

Jackson, Erickson and Miss Golich left Erickson's home at about 4:30 that afternoon; Jackson had to be at work that evening as a bartender at the Ragdoll Tavern. Apparently he was a part-time bartender, and the evidence shows that he had not been working the night before. Erickson said that when the three of them left his house, the streets were wet. There had been a storm and there were tree limbs scattered on the roads. Erickson also mentioned that there were puddles "all over the road."

"There was a [puddle of] water about 100 feet [long] from the north end to the south end in the middle of River Road. It covered the northbound [sic] and east side on the northbound, in the lane a little bit. Three lanes were covered with water. The northbound was all covered with water, and the southbound was one lane. It had a little water on it too. Both of the southbound lanes were covered by this hundred foot area of water that I am describing. There was water in the westernmost northbound lane from this puddle.

"I would say Jackson was going at 30 miles per hour at the time of the accident. The speed limit on River Road varies from 40 to 45 miles per hour. Jackson had his windshield wipers on. He was traveling in the inside lane, going south. That would be the lane next to the double yellow line in the center. . . . I saw the puddle. I knew it was there before because I had been up and down the road before. That trip was the first time I saw it that day. I was about 100 to 150 feet from the puddle when I saw it. There were some barricades by the yellow line in the middle of River Road which described one-lane travel, one lane of traffic coming from the south and going to the north. The sign said, 'One Lane of Traffic.' When Jackson came upon the puddle and the sign, he started slowing up to about 10 to 15 miles per hour, and then the car died, or ground-

ed, out. We had to make the turn to go through the single lane because we didn't see any cars coming. There were no cars up ahead of us at all. Our car was facing southeast at the time of the accident. . . . When Jackson veered his car to the left, the car died out. I was watching, and Jackson was trying to start the car. The car was not in motion when he was trying to start it. I was watching Jackson start the car. As to whether I saw the other car that was involved in this collision, I just happened to glance up, and it looked like the car was coming right on me. . . ." The witness remembered nothing further until he awoke in the hospital.

Daniel Engels then took the stand and testified that he was Earl Jackson's employer at the time of the accident. He stated that his company at no time furnished automobiles for its salesmen. The plaintiffs then dismissed the defendant Daniel Engels, doing business as Engels Rambler Sales, from the case with prejudice, by stipulation.

Eugene Oddo was called to testify under section 60 of the Civil Practice Act, supra. He testified that he managed Oddo's Lounge and that the lounge was held in his wife's name. He said he did not work on April 16, 1960. He said the first he heard of the accident was when he and his wife were served with summons on May 1, 1961—slightly over a year following the occurrence.

Stephen Spanczak, the next witness to testify, was employed by the Village of Franklin Park as a police officer. He testified: "[On April 17, 1960] Patrolman Nooner, Sargeant [sic] John Brosman, Officer Duffy and I received notice of an accident at about 3500 River Road. I proceeded to the scene at once, traveling north on River Road from Belmont. The . . . center lane of northbound traffic was covered by water and both south-

bound lanes of traffic were covered with water. I saw barricades just prior to coming up to 3500 River Road. . . . The barricades for the northbound lane were in place, but the barricades for the southbound lane were all splintered, torn apart and knocked down. . . .

"At the scene of the accident I observed a 1955 Plymouth which was located in the water, partially over the southbound lane, facing in a northeast direction." The 1955 Plymouth was practically facing the same as the other vehicle—the 1959 Mercury—and was approximately 10 or 15 feet west of the other car. "At that time it was raining and the pavement was wet. The lighting conditions were very good."

This witness said he saw Mr. Erickson on the pavement of the road and while he was attending to him, noticed a very strong odor of alcohol about him. He also noticed that Jackson also had a very strong odor of alcohol on his breath and "he was not himself." He did not notice the condition of Miss Golich.

On cross-examination, Officer Spanczak stated he used four photographs and the accident report to refresh his recollection before coming to court to testify. He identified the photographs and the report and stated that the report was in the same condition that it was in when he made it out, except for the exhibit mark. He then identified a verifax copy of the accident report and stated that the copies are prepared by an officer at the police station. His copy of the report, however, showed an "x" in a box to signify that Jackson had been drinking at the time of the accident. The verifax copy shows no such "x." Officer Spanczak said he remembered putting in the "x" to show that Jackson had been drinking the day the report was made out. He did not know how it came about that the verifax copy did not show the "x." He later said that he was mistaken when he said the Plymouth automobile was facing in a northeast

direction, that it was facing southeast. This witness again stated that he had independent recollection of this accident, and that Erickson and Jackson had the odor of alcohol on their breaths.

Officer Nooner then testified, but added nothing new to what was said by Officer Spanczak.

Mary Louise Golich took the stand on behalf of the plaintiffs. She said she was with Erickson and Jackson the night and morning before the accident. She said she could not swear that Jackson had been drinking at Oddo's Lounge that night. She stated that she went home that night and was picked up the next afternoon at her home by Jackson. She said the only thing anyone had to drink that afternoon was coffee. She stated that neither Erickson nor Jackson was intoxicated the night of April 16, 1960. She also said that in her opinion neither of them was intoxicated the following afternoon when she saw them again.

Winifred Zenow took the stand and testified that she was a court reporter and that she took the testimony of Earl Jackson on November 29, 1960. Jackson was not available for questioning at the time of the trial. The last anyone had heard from him he was in South America. During this deposition, Jackson said that the three of them—Erickson, Miss Golich and himself—had spent the night at Erickson's house. He said they got up at about 3:30 or 4:00 o'clock the afternoon of April 17 and ate some breakfast. He said that each of them had a can of beer or two before leaving the house. He then said that they had been to various places during the day and that he had taken an alcoholic drink in each of them. He said he was not speeding before the accident. When he approached the puddle he slowed down. He stated he did not see the Pellico car approach. He said that as he hit the puddle his automobile stalled, and he was trying to start it when the accident occurred.

Dr. Eugene M. Narsete was the doctor who treated Earl Jackson when he was brought to the hospital following the accident. He said that there would be a medical reason to note on the record whether or not Jackson was intoxicated. "This would be, to be certain, we would be apprised of this fact insofar as medication is concerned. This is what we call charting during the initial period of hospitalization. By charting, we mean watching the patient. If he had been under the influence of alcohol, this . . . would alert us to this fact. From a medical point of view, that would be the only reason why it would be so indicated. On recross-examination, this witness said, "According to the records, the man in question was not intoxicated."

At this point in the proceedings a motion to dismiss the defendant, Oak Park National Bank on the grounds that it was trustee under a passive trust, was allowed. A motion for a directed verdict at the close of the plaintiffs' evidence on behalf of Shirley Oddo, Carmen Trimarco and Frances Trimarco was also allowed. The case of the counter-plaintiff went mostly to the extent of his injuries, all the evidence concerning the cause of the accident having been set out above. The court withdrew the question of the contributory negligence of both passengers from the jury, and, the jury verdicts found in favor of Frank Pellico on the counterclaim of Earl Jackson, in favor of Earl Jackson on the complaint of Frank Pellico, in favor of Sam Kleveno and George Boese doing business as the Ragdoll Tavern and against both plaintiffs, in favor of James Erickson and against Frank Pellico in the sum of $15,000 and in favor of Stephanie Pellico and against Earl Jackson in the sum of $10,000.

The appellants assign as error the giving of an instruction by the court that Erickson was not guilty of contributory negligence as a matter of law. It is also

327

claimed that any finding that Frank J. Pellico was negligent was against the manifest weight of the evidence. The claim is also made that the elements of a dramshop action were established against Oddo's Lounge and that it was error for the court to direct a verdict for Shirley Oddo, Carmen Trimarco and Frances Trimarco. The appellants claim that the jury verdict in favor of the owners of the Ragdoll Tavern was against the manifest weight of the evidence.

Other errors assigned include the court's rulings on the admissibility of certain evidence, alleged improper cross-examination of Officer Spanczak, and the court's refusal to call Mary Golich as a hostile witness.

■ ■ The first points we shall deal with are the directed verdict regarding Oddo's Lounge and the jury finding in favor of the Ragdoll Tavern. We believe that there is a complete failure of proof to connect the accident with any liquor which may have been served Jackson at either of these establishments. The Act on which this action is based is section 135 of the Liquor Control Act, Ill Rev Stats, 1959, c 43, sec 135. That section provides in part:

> "Every person, who shall be injured, in person or property by any intoxicated person, shall have the right of action in his or her own name, severally or jointly, against any person or persons who shall, by selling or giving alcoholic liquor, have caused the intoxication, in whole or in part, of such person; . . ."

The language of the statute is clear that to be held liable under this section, the defendant must have sold liquor which contributed to the intoxication of the person who caused the injury complained of. In the case at bar, Jackson had finished drinking that morning, had gone to Erickson's house and slept for approximately

six hours, and there was evidence he had taken a meal before driving the car again. There is no evidence that he was still intoxicated from the night before, and we see no way in which such an assumption properly can be made. We hold that the court below was correct in directing a verdict in favor of Oddo's Lounge, and we believe he would have been acting properly to direct a verdict in favor of the Ragdoll Tavern as well.

██ The next point to be considered is whether or not the court acted properly in taking the question of Erickson's contributory negligence from the jury. In his deposition, Earl Jackson said he had been drinking beer on the afternoon of the accident. Officer Spanczak testified he remembered smelling alcohol both on Erickson's and Jackson's breath when he was investigating the accident. Jackson's deposition indicated that he had been drinking that afternoon. While it is true that Miss Golich and Erickson both denied that anyone had had anything to drink, and while it is true that there are verifax copies of the police report that indicate that Jackson had not been drinking, we cannot decide which version of the events is accurate. The court, in effect, directed a verdict on this issue; we believe this constituted error. There was *some* evidence that Jackson had been drinking the afternoon of the accident and that Erickson knew or should have known this. There is also a question of whether Erickson should have remained in the stalled auto when it might be hit by oncoming traffic. There was enough evidence for the question of Erickson's contributory negligence to go to the jury. "As long as a question remains whether either party had observed that degree of care and caution imposed upon him by law, and the determination of the question involves the weighing and consideration of the evidence, the question must be submitted as one of fact." Willoughby v. Moyer, 50 Ill App2d 462, 466, 200 NE 2d 522, 524, (1964).

■ The next claim is that the finding that Frank J. Pellico was negligent was against the manifest weight of the evidence. While the jury did not return special verdicts, it is clear that they found Mr. Pellico guilty of negligence, for they permitted recovery against him by James Erickson. Mr. Pellico testified, "At this time, I do not recall whether I saw his car at any time within 50 feet of my car. . . . I did not apply the brakes to my automobile at any time prior to this occurrence. . . ." We think that from this testimony alone the jury could have found that he had been driving negligently when the accident occurred. It is clear from all the evidence that the length of road on which the accident took place was potentially hazardous. The fact that Pellico did not see the car approach him could be interpreted as showing a lack of care on his part. According to the testimony of Erickson, Jackson's car had stalled and was perfectly still when the Pellico car ran into it. If the jury believed this account, certainly there would be a strong indication of negligence on the part of Pellico. It seems clear, therefore, that there was some evidence of negligence on the part of Pellico. The jury could properly have reached the conclusion it did. Willoughby v. Moyer, supra.

■■ Next, it is argued that the court below erred in refusing to admit a certified copy of a divorce decree and a report of the proceedings in Jackson's divorce case. This decree entered on the complaint of his wife, severed the bonds of matrimony on the grounds of the husband's habitual drunkenness. The general rule in this state is that general habits are admissible only where there are no eyewitnesses to the occurrence. The only cases from Illinois which we have found dealing with this matter are cases where the courts have permitted testimony as to the general habits of due care on the part of a deceased or one incompetent to testify. The appellants have, however, cited two cases from other

330

jurisdictions which they say support this proposition. One of the cases, Hardeman v. Georgia Power Co., 42 Ga App 435, 156 SE 642 (1931), appears in abstract only, and none of the court's reasoning is set out. The other case is McCarty v. Gappelberg (Tex), 273 SW2d 943 (1954).

We feel the courts of this state have adhered to the general rule that where there are witnesses competent to testify, reputation evidence such as this cannot be permitted to come in. In weighing the probative value of such evidence against the possible prejudice it might cause, our courts have held that the interests of justice require that such evidence as is sought to be introduced here must be excluded. The court below was correct in refusing to admit such evidence.

■ The next claim of error is that the court below limited the deposition of Jackson to the action between Jackson and the Pellicos. The claim is made that the statement by Jackson that he had two beers the afternoon of the accident should be admissible against both Oddo's and the Ragdoll Tavern. As we have said before, there is no proof of any connection between whatever liquor may have been consumed in these two establishments and the accident which occurred approximately 10 hours later. This statement can only affect the issues of the negligence of Jackson and the contributory negligence of Erickson.

■ ■ The next argument raised by the appellees is that Officer Spanczak should not have been cross-examined concerning those copies of the police reports which did not show the mark indicating that Jackson had been drinking. We believe such cross-examination was perfectly proper. It was established by competent testimony that all the copies were made by the police from the original report. It was also shown that the copying machine reproduced every mark on the paper except the "x" in question. This being so, a perfectly

331

valid question arises concerning whether the mark in question was placed on the form when it was first filled out. Officer Spanczak said he had an independent recollection of placing the mark on the police form. What should be the final status of the police report is a question for determination by the jury. Officer Spanczak need not be personally connected with each copy of the report. It is enough that he said that he marked it a certain way when it was made out, and that copies made after that time do not have such a mark. We hold that the cross-examination was proper.

█ The final question for determination is whether the court should have called Mary Lou Golich as a hostile, or court's witness. The appellants' claim in this respect is that Miss Golich testified inconsistently with an earlier deposition she gave in order to protect her own lawsuit against Pellico. The appellants argue that they had to bring Miss Golich in as a witness so that the jury would not draw unfavorable inferences concerning her absence, but urge that under the circumstances, they should not be required to vouch for her credibility.

The record shows that there were discussions had among the attorneys and the court concerning this problem. The court stated that he would permit the Pellicos' attorney to ask leading questions of Miss Golich in those cases where she testified in a manner clearly contrary to her previous deposition. Except for the question of whether she spent the night at Erickson's house, however, it is not clear that there was any major inconsistency in the testimony of Miss Golich. We do not feel that the court below abused his discretion in refusing to call Miss Golich as a court's witness.

Considering the fact that the actions here involved both claims and counterclaims and multiple parties— some of whom will not be involved in any further action in this case—we feel the interests of justice will be served by reversing the judgments in favor of Mrs.

Pellico and Erickson, and remanding the cause. The judgments in favor of George Boese, Sam Kleveno, d/b/a The Ragdoll Tavern, Shirley Oddo, d/b/a Oddo's Restaurant and Lounge, Carmen Trimarco and Frances Trimarco, are affirmed. The actions of the Pellicos against Jackson and of Erickson against the Pellicos are remanded for further proceedings not inconsistent with this opinion.

Judgment affirmed in part, reversed in part and remanded with directions.

LYONS and BURKE, JJ., concur.